UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| I.V., a minor child; and APRIL OLIVARES and FERNANDO OLIVARES VARGAS, parents of I.V., <br><br>                Plaintiffs, <br><br>    v. <br><br> WENATCHEE SCHOOL DISTRICT NO. 246, <br><br>               Defendant. | NO. 2:17-CV-0118-TOR <br><br> ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT DISMISSAL OF PLAINTIFFS' TITLE IX CLAIM; GRANTING IN PART DEFENDANT'S MOTION TO STRIKE |

BEFORE THE COURT is Defendant Wenatchee School District's Motion for Summary Judgment Dismissal of Plaintiffs' Title IX Claim (ECF No. 40) and Motion to Strike (ECF No. 59). The Court held a hearing in Spokane, Washington on September 12, 2018 and heard oral argument from the parties. The Court has reviewed the files and the record, and is fully informed. For the reasons discussed

below, the Motion for Summary Judgment (ECF No. 40) is **granted** and the

Motion to Strike (ECF No. 59) is **granted in part**.

## STANDARD OF REVIEW

A movant is entitled to summary judgment if "there is no genuine dispute as

to any material fact and that the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the suit

under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). An issue is "genuine" where the evidence is such that a reasonable jury

could find in favor of the non-moving party. *Id.* The moving party bears the

"burden of establishing the nonexistence of a 'genuine issue.'" *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 330 (1986). "This burden has two distinct components: an

initial burden of production, which shifts to the nonmoving party if satisfied by the

moving party; and an ultimate burden of persuasion, which always remains on the

moving party." *Id.*

Only admissible evidence may be considered. *Orr v. Bank of America, NT*

*& SA*, 285 F.3d 764 (9th Cir. 2002). The nonmoving party may not defeat a

properly supported motion with mere allegations or denials in the pleadings.

*Liberty Lobby*, 477 U.S. at 248. The "evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in [the non-movant's]

favor." *Id.* at 255.  However, the "mere existence of a scintilla of evidence" will not defeat summary judgment.  *Id*. at 252.

## BACKGROUND[1]

As the Court previously observed, ECF No. 36, the instant action arises out of an unfortunate series of events that occurs all too often: bullying[2] at school.

A. **YAF conduct toward IV**

1. ***Sixth Grade (2013-14): IV meets YAF; verbal abuse; pinching sides***

IV first met YAF at Orchard Middle School when IV entered the sixth grade; YAF started bullying IV at the beginning of this year.  ECF No. 42-1 at 4-5. IV testified that YAF threatened to kill him quite a bit, beginning in 6th grade, ECF No. 42-1 at 20, and that YAF would call him names every day, including calling him "fat", "faggot", and "man boobs."  ECF No. 42-1 at 15.  A fellow

---

[1]     The material facts are generally not in dispute and the Court has construed any disputes in favor of Plaintiffs.  The background is limited to the facts necessary for the decision.

[2]     The Court is aware that the Parties' experts distinguish the term bullying from harassment, but the Court uses the terms interchangeably.  What is important is the animating factor behind the conduct, whether labeled bullying or harassment.

student and friend of IV ("student 1")[3] testified that YAF verbally abused IV during the 6th grade, including calling him "fat," "fag," "gay," and "bitch." ECF No. 51-4 at 4-5. Another student and friend of IV ("student 2") testified that, beginning in sixth grade, YAF called IV "pig and stuff like that because he was – he was chubby" and that YAF would pinch IV's sides where he had extra skin or fat. ECF No. 51-7 at 4. Student 2 testified that this pinching was the only physical abuse in the sixth grade and that this is "how it all started." ECF No. 51-7 at 4-5.

Sometime in sixth grade, student 2 told Taunya Brown, principal at Orchard Middle School, that IV is getting "bullied" by YAF. ECF No. 51-7 at 5-6. Ms. Brown told student 2 she "will see into it." ECF No. 51-7 at 6. Student 2 also recalled telling special education assistant Teri Self that IV was getting "picked on" (and may have also used the term "bullied").[4] ECF No. 51-7 at 10. According to student 2, Ms. Self spoke with YAF and told him to stop, telling him his conduct "wasn't cool." ECF No. 51-7 at 10.

---

[3]     The Court uses "student 1" and "student 2" to protect their identity.

[4]     Ms. Brown and Ms. Self deny having received any reports from student 2. ECF No. 40 at 19, n.5. The Court assumes student 2's account is accurate for purposes of this Order.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT DISMISSAL OF PLAINTIFFS' TITLE IX CLAIM; GRANTING IN PART DEFENDANT'S MOTION TO STRIKE ~ 4

### 2. *Seventh Grade (2014-15): bullying gets more physical; IV hospitalized*

Student 1 testified the bullying became more physical in the 7th grade: YAF "[b]arely start[ed] to get physical . . . . Like punching [IV] once in a while like in the arm or something like that." ECF No. 51-4 at 6. Student 2 testified:

> [I]t got a little bit worse in seventh grade. . . . [YAF] started grabbing [IV's] boobs . . . and pinching them. Just pushing him around. He was calling him more names. . . . like, "You're fucking fat" and stuff like that. He -- he pushed him into a locker and stuff like that.

ECF No. 51-7 at 6-7. Ms. Self recalled that, sometime during the year, an unidentified student told her that IV was being bullied for his weight and was receiving "titty twisters" in the locker room; Ms. Self relayed the report to Ronda Brender, the school counselor at Orchard Middle School. ECF No. 51-6 at 6. Ms. Self was not aware of who the perpetrator was, although she was generally aware that YAF was frequently disciplined for bullying behaviors in classrooms. ECF No. 51-7 at 7.

IV testified that YAF would "twist [his] nipples" and kick, punch, trip, and push him. ECF No. 42-1 at 17. IV also testified that YAF extended his efforts to social media, where YAF would post things on Snapchat and other "apps" (including calling IV fat and posting demeaning and offensive drawings of IV) and then tell IV to look at the posts. ECF No. 42-1 at 18. He would also send IV texts

telling him he was fat and ugly and that he should kill himself. ECF No. 42-1 at 19.[5]

Sometime in January 2015, IV was admitted to the hospital as a result of him becoming anorexic. At this time, IV finally told his mother he was being bullied at school. ECF Nos. 41 at 3, ¶¶ 9-10; 43 at 2, ¶ 5. IV told his mother he was being called "fat", a "faggot", and that his nipples are being twisted, but IV did not name the bully because "he was really scared and he didn't want to be labeled as a snitch and be bullied by others." ECF Nos. 41 at 4, ¶ 13; 42-3 at 6, 9. Soon after, IV's mother informed Ms. Brender that IV was being bullied during physical education class ("PE") and in the locker room and that it included someone calling IV "fat" and a "faggot" and twisting his nipples. ECF Nos. 41 at 3, ¶ 11; 42-3 at 9. Ms. Brender then contacted the PE teacher (Steve Donaldson) and asked him if he had observed any bullying of IV. ECF Nos. 41 at 4, ¶ 17; 43 at 2, ¶ 9. Mr. Donaldson reported that he had not seen any bullying and told Ms. Brender he would keep an eye on IV to look out for IV to make sure he was not being bullied. ECF Nos. 41 at 4, ¶ 18; 43 at 3, ¶ 10. IV's schedule was later changed so IV would not attend

---

[5]     It is not clear when this conduct occurred, although the conduct conforms with what student 1 and 2 observed in the seventh grade; there is no mention of any Snapchat posts or texts otherwise in the record to date this conduct.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT DISMISSAL OF PLAINTIFFS' TITLE IX CLAIM; GRANTING IN PART DEFENDANT'S MOTION TO STRIKE ~ 6

PE, although the parties dispute why it was changed.  ECF Nos. 41 at 4, ¶ 19; 43 at 3, ¶ 11; 49 at 4, ¶ 11.  Principal Brown testified that she was aware of the eating disorder, but was not aware it was related to bullying until January of the next year.  ECF No. 51-2 at 12.

IV did not return to school that year until June.[6]  ECF Nos. 41 at 4, ¶ 20; 43 at 3, ¶ 12.

### 3. *Eighth Grade (2015-16): IV loses weight; bullying worse; YAF expelled*

Student 1 testified that, in eighth grade, "[i]t just started getting like a little bit more, like, too, like, extreme."  ECF No. 51-4 at 7.  Student 1 explained: "Like he kept saying like -- it was almost like almost every single day he kept . . . just telling him, like, bad words.  And like sometimes, just like, the same thing, like, punching him and stuff or pinching" IV's nipples.  ECF No. 51-4 at 7.  According to Student 1, YAF would do "something physical" to IV in the classroom almost every other day, and that YAF also targeted IV in the halls and during lunch break.  ECF No. 51-4 at 8.  Student 1 noted that YAF would "like start[] laughing and stuff like that" after YAF pinched others (including IV) on the chest.  ECF No. 51-4 at 8.

---

[6]     Ms. Brender recalled IV returned one day on April 11, 2015, but Plaintiffs dispute this.  *See* ECF No. 49 at 4 ¶ 14.  This dispute is immaterial.

Student 2 also testified that in the eighth grade things changed: "that's when -- well, [IV] came back. He was -- he was different. . . . He got skinnier. . . . It affected him more. And then that's when [YAF] was still bullying him. He was called -- well, [YAF] was still calling [IV] the same names and he -- well, he still pushed him around." ECF No. 51-7 at 8. Student 2 went "a few time" to Ms. Brown's office and told her IV is getting "bullied" and that "[i]t's been over three years and you haven't done anything." ECF No. 51-7 at 8. Ms. Brown said she would talk to YAF. ECF No. 51-7 at 8.[7]

IV had not told his mother the bullying continued after his hospitalization— IV's mother would ask IV if he was still getting bullied, but IV would tell her "no" and to "mind [her] own business", and then IV would "shut down." ECF No. 42-3 at 7. However, on January 3, 2016, ECF No. 42-3 at 7, IV told his mother that he was being bullied still and finally and for the first time told her YAF was the perpetrator. ECF Nos. 42-3 at 3. IV explained that he revealed the identity of YAF because he "had enough" after YAF threatened to kill him again. ECF No. 42-1 at 10. Before this, IV had not told anyone else that YAF was bullying him,

---

[7] Ms. Brown testified that she was not aware YAF was bullying IV until January 4, 2016. *See* ECF No. 55 at 18, ¶ 53. The Court must accept Student 2's testimony for purposes of summary judgment.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT DISMISSAL OF PLAINTIFFS' TITLE IX CLAIM; GRANTING IN PART DEFENDANT'S MOTION TO STRIKE ~ 8

although his friends were present during such and he talked with them about it. ECF No. 42-1 at 10.

IV's mother contacted Ms. Brown and the police on January 4, 2016. ECF No. 41 at 5, ¶¶ 24-25. That same day, IV's mother and father met with Ms. Brown at 1:00 in the afternoon. ECF No. 42-3 at 5. A police report documented an incident that occurred that very day between IV and YAF. According to the report, students were playing basketball in the gym during lunch when IV told YAF to stay away because he was mean. ECF No. 51-11 at 2-3. YAF got in IV's face and was yelling "what's up" and then told him "lad[ies] first" when he let IV leave the gym before him. ECF No. 51-11 at 3. The police report also details how YAF told IV: "I'm gonna kick your ass" and "you're dead bro . . . you're dead" sometime in the hallway. ECF No. 51-11 at 3; *see* ECF No. 50 at ¶ 5.

On January 5, 2017, Defendant emergency expelled YAF. ECF No. 41 at 5, ¶ 25. Defendant transferred YAF to another school after determining YAF's conduct was not a result of a disability and after learning IV obtained an order of protection that precluded YAF from attending Orchard Middle School. ECF No. 41 at 5-6 ¶¶ 26-28.

B. **YAF conduct towards peers and authority; discipline**

YAF did not exclusively target IV. Rather, IV testified that YAF bullied "a lot of people." ECF No. 57-5 at 4-5. IV specifically testified that YAF would

bully him and his friends (a group of at least two to three other students) over the course of middle school (6th, 7th, and 8th grade), which only ended after YAF was expelled in January, 2016.  ECF No. 42-1 at 5-8.  Student 1 testified that YAF bullied "[p]retty much like all our friends . . . .  He used to like, come in, and, like, just say stuff to us and stuff."  ECF No. 57-1 at 5.  Student 1 recounted personal attacks: "you know, like, [YAF would say:] 'You're a faggot" and stuff like that [to me].  He used to pinch me too like [IV.]"  ECF No. 57-1 at 6.  Student 2 also recounted personal bullying, stating YAF "did the same thing" as he did to IV. ECF No. 57-2 at 5.

Ms. Self testified that she had seen YAF mocking people, making fun of them verbally, and physically moving his body in an inappropriate manner to intimidate people.  ECF No. 57-4 at 5.  She testified that she would classify YAF as a "bully.  Old-fashioned term: A needler. . . .  Provoker is a good word."  ECF No. 57-4 at 6.  Other testimony shows YAF targeted another student, calling him "ballsack boy", ECF No. 57-3 at 5, and also targeted another female student, who he was "mean to since school started[,]" telling her she "looked like a cow" and a "potato" and made faces at her "like eww get away from me."  ECF No. 57-6 at 7.

YAF had a long history of inappropriate behavior – toward both his peers and authority – and corresponding discipline.

- Underline: School Year 2010-2011: YAF was written up for lying on April 22, 2011; a parent conference was held. ECF No. 57-6 at 3.

- Underline: School Year 2012-2013: YAF was written up for lying to his teacher on September 26, 2012; a parent conference was held. ECF No. 57-6 at 3. YAF was written up for sexual harassment on October 10, 2012[8] and bullying on October 22, 2012 ("Pushed student to the ground – got on top and would not let up") and was suspended three days each time. ECF No. 57-6 at 3. YAF was written up for defiant and aggressive behavior on March 28, 2013 and for telling the recess teacher he hated her on May 23, 2013; a parent conference was held each time. ECF No. 57-6 at 2-3.

- Underline: School Year 2014-2015: YAF was written up for "[c]ontinual disruption to the learning environment – Refusal to follow substitute teacher . . . directives" on October 21, 2014, and a parent conference was held. ECF No. 57-6 at 2. YAF was written up for disruptive behavior on December 2, 2014 ("Shadowing, arguing and kicking hair") and defying school authority on December 17, 2014 ("Repeated disruption in class, disrespect to staff)

---

[8]  Ms. Self recalled going to the assistant principal after YAF attempted to look up a girl's skirt. ECF No. 57-4 at 4. It is not clear whether this was a separate event from the report of sexual harassment on October 10, 2012.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT DISMISSAL OF PLAINTIFFS' TITLE IX CLAIM; GRANTING IN PART DEFENDANT'S MOTION TO STRIKE ~ 11

and was suspended one day in both instances. ECF No 57-6 at 2. YAF was written up for disruptive behavior on January 20, 2015 ("Disruptive to the learning environment— Interfering with the learning of others, laughing and arguing in class. When he left the classroom he very aggressively slammed the door") and February 17, 2015 ("Showing off his 'Sea Cocks' sign deliberately to staff member."); YAF was suspended for the incidents for 3 days, and 4 days, respectively. YAF was written up for sexual harassment on May 26 ("violated personal space of female student in a sexual nature."[9]); YAF was suspended for 3 days. ECF No. 57-6 at 2. A document dated January 28, 2015 includes a report that YAF was being mean to a girl and that someone met with YAF and told him to stop and noted he will be monitored. ECF No. 51-8 at 2. By April of 2015, YAF was subject to a "Behavior Improvement Plan" where he would be rewarded for good behavior. ECF No. 57-6 at 10.

---

[9] A "complaint of harassment/bullying" report states a female was at a bottom locker when YAF came up to his locker (on top) and "pressed his privates into her personal space." ECF No. 57-6 at 2-3, 5

- <u>School Year 2015-2016</u>.  A "student incident report" dated September 29, 2015 recounts multiple examples of YAF's improper conduct, where YAF refused to move to independent reading, "jumped up [and] at" the teacher when asked to refocus, and made a "sexual tongue gesture".  *See* ECF No. 57-6 at 9.  The report notes two people met with YAF to discuss his behavior and to make a plan.  ECF No. 57-6 at 9.  In another complaint dated October 22, 2015, reference is made to an unknown issue between YAF and another student, noting it is becoming more physical and that YAF will be monitored.  ECF No. 57-6 at 8.

- <u>School Year 2016-2017</u>:  YAF was not written up for any incident in 2016 except for his conduct toward IV after IV's mother contacted Ms. Brown and identified YAF.  *See* ECF No. 57-6 at 2.  YAF was permanently expelled soon after.

C.  **Procedural History**

Plaintiffs filed suit on March 13, 2017, asserting a Section 1983 action, a Title IX sexual discrimination action, and a negligence claim.  The Court dismissed the Section 1983 claim with leave to amend.  *See* ECF No. 37.  No amendment was filed.  The Title IX claim is now before the Court on summary judgment.

**DISCUSSION**

A. **Motion to Strike**

As a preliminary matter, Defendant requests the Court strike portions of the

declarations of Susan Strauss and April Olivares.  ECF No. 59 at 1-2.

1. ***Susan Strauss***

Defendant requests the Court strike portions of the opinion of Plaintiffs'

expert, Susan Strauss—specifically her opinion as to the motivation behind YAF's

conduct (*i.e.*, whether it was "because of" sex).  ECF No. 59 at 2.  Defendant relies

on Federal Rule of Evidence 702.  ECF No. 59.

Federal Rule of Evidence 702 governs the admission of expert testimony.

Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or date;
> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

Under this rule, "the trial judge must ensure that any and all scientific testimony or

evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell Dow*

*Pharm., Inc.*, 509 U.S. 579, 589 (1993).  The trial judge's determination as to

whether to exclude testimony under Rule 702 is reviewed for abuse of discretion. *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002).

In order for expert testimony to be reliable, "[t]he reasoning between steps in a theory must be based on objective, verifiable evidence and scientific methodology of the kind traditionally used by experts in the field." *Domingo*, 289 F.3d at 607. As the Supreme Court has recognized, "the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert,* 509 U.S. 579, 590 (1993). As such, "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 137 (1997). Indeed, "Rule 702 requires that expert testimony relate to scientific, technical, or other specialized knowledge, which does not include unsupported speculation and subjective beliefs." *Guidroz-Brault v. Missouri Pac. R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001). "[I]n the context of a motion for summary judgment, an expert must back up his opinion with specific facts." *United States v. Various Slot Machines on Guam*, 658 F.2d 697, 700 (9th Cir. 1981); *Guidroz–Brault.,* 254 F.3d at, 831-32.

Plaintiffs rely on the expert opinion of Susan Strauss in support of its opposition to Defendant's Motion for Summary Judgment (ECF No. 40). *See* ECF No. 50 (declaration of Susan Strauss). Ms. Strauss opines that YAF "may not have

been using the terms 'gay' or 'faggot' to call [IV's] sexual orientation into question, but rather as a way to demean him for his failure to fit into the 'box of masculinity'" because IV "didn't physically appear, to [YAF], to fit into the masculine norm which is a form of gender-based sexual harassment". ECF No. 50 at ¶ 5. Ms. Strauss also opines that the bullying IV experienced "was unquestionably sexually driven". ECF No. 50 at ¶ 8.

The opinion of Ms. Straus as to YAF's motivation will be excluded. <u>First</u>, Ms. Straus's opinion is not based on adequate information. Ms. Strauss did not interview YAF and there was no deposition of YAF to review. Ms. Strauss does not identify what YAF's view of masculinity is or provide any support for her belief that YAF has such a view or that YAF targeted IV based on such. Further, although Strauss stressed the need to look at all of the circumstances for determining one's motivation, Strauss testified that she did not know if YAF called every other boy "gay" or "fag" and that she did not know whether YAF pushed, kicked, or hit other kids in the class. ECF No. 63-1 at 9. This shows she does not consider the full constellation of facts, as is required for the issue at hand.

<u>Second</u>, Ms. Strauss failed to set down any principles connecting the data and her conclusion. Rather, it is clear the opinion rests upon her own *ipse dixit*. This extends to her assumptions about YAF's view of masculinity and assumptions that YAF bullied IV because IV failed to fit YAF's view of masculinity. In other

words, Ms. Strauss rests her position based on a mere recitation of some facts, which is far from helpful in aiding the fact-finder. *See* ECF No. 50 at ¶ 5. <u>Third</u>, Ms. Strauss's statements, in and of themselves, demonstrate the speculative nature of her opinion. Ms. Strauss opines "YAF <u>may not</u> have been using the terms 'gay' or 'faggot' to call [IV's] sexual orientation in to question, but rather as a way to demean him for his failure to fit into the 'box of masculinity'." ECF No. 50 at 2-3, ¶ 5. This ambivalence demonstrates the unreliability of Ms. Strauss's opinion and highlights the speculative nature of her opinion.

Notably, Ms. Strauss often resorted to rhetorical questions in defending her position at her deposition and otherwise relied on unsubstantiated generalizations to reach her conclusion. ECF No. 63-1 at 9. For example, at her deposition, Ms. Strauss was asked how she knew YAF did not believe IV fit the stereotype of masculinity, but she was only able to answer with a rhetorical question: "Well, why would he be making those comments to him about his, quote, man boobs? . . . Have I talked to [YAF] about that? No. But that's how it appears to me." ECF No. 63-1 at 9. This shows she has no support for her contention other than it is how it appears to her. Also, when questioned about whether comments about IV having "man boobs" referred to him simply being overweight as opposed to not fitting some stereotype of masculinity, she replied: "I think that if he was overweight, there were other names that he could have called him other than

targeting his breasts." ECF No. 63-1 at 9. Notably, YAF did call IV other names, such as "fat", and Strauss does not deny the slur "man boobs" could simply refer to IV's weight at the time. This shows Ms. Strauss is resting on pure speculation, rather than applying reliable principles in reaching her opinion.

Moreover, when asked whether the term "man boobs" is something that fits in the definition of sexual harassment, ECF No. 63-1 at 4), Ms. Strauss testified that she does not "think the motivation matters so much as how it impacts the target." ECF No. 63-1 at 7. She later states that motivation "plays a role" but she "think[s] as well, there could be boys -- in this case, [YAF] -- who would target IV and not even be aware of why he's targeting him and making those comments to him." ECF No. 63-1 at 7. Given Strauss' misplaced view that (1) one may not even be aware of his/her motivation under Title IX and (2) motivation does not matter as much as how it impacts the target <u>in determining whether YAF's conduct was because of sex</u>, the opinion is beyond reliable.

Because the expert opinion (as to the motivation behind YAF's conduct toward IV) is purely speculative, based on inadequate data, and based on an apparently erroneous view of what is required under Title IX, the opinion is not admissible and is not considered in the analysis for summary judgment.

2. *April Olivares*

Defendant takes issues with several portions of Ms. Olivares' declaration. First, Defendant take issue with the Ms. Olivares statement that YAF was at Orchard Middle School on February 1st "because [IV] saw him . . . that day". ECF No. 59 at 8; *see* ECF No. 49 at 2, ¶ 4. Second, Defendant takes issue with Ms. Olivares' statements regarding Ms. Brender's knowledge or intent: "She knew that this was an ongoing problem, and is trying to paint it as a single incident." ECF No. 59 at 11; *see* ECF No. 49 at 3, ¶ 9. Defendants are correct that Ms. Olivares does not have personal knowledge with respect to these claims, so the assertions are stricken. *See* Federal Rule of Evidence 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

Third, Defendant argues Ms. Olivares' statements about whether Ms. Brown informed School Resource Officer Miller about YAF bullying IV should be stricken because it does not dispute Ms. Brown's statement that she did, in fact, relay the information to Miller. ECF No. 59 at 9-10; *see* ECF No. 49 at 1-2, ¶¶ 2-3. Fourth, Similarly, Defendant argues Ms. Olivares' statement that she "was never informed of this conversation and didn't know that the PE teacher was involved at all" does not create a factual dispute and should be stricken. ECF No. 59 at 11; *see* ECF No. 49 at 4, ¶ 10. For both of these complaints, Defendant is

correct that the statement do not create a genuine dispute as to the underlying assertion, but this is not a valid reason to strike the complained of portions, as they merely relate what Ms. Olivares was aware of, believed, or witnessed. *See* ECF No. 49 at 2-4, ¶¶ 2-3, 10 ("To my knowledge, she did not contact Officer Miller"; "he did not mention that any law enforcement had been contacted"; "I was never informed of this conversation and didn't know that the PE teacher was involved at all.").

B. **MSJ**

Defendant argues the complained of conduct, while not acceptable, does not give rise to liability under Title IX because Plaintiffs have failed to bring forth competent evidence that YAF bullied IV "because of sex". Defendant further argues that, even if the underlying conduct is actionable under Title IX, Defendant did not have actual knowledge of the conduct and, in any event, Defendant was not deliberately indifferent in responding to YAF's conduct. The Court agrees with Defendant.

Title IX states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). "Title IX does not by its terms create any private cause of action"; "[t]he only private cause of action under Title IX is

judicially implied." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 656 (1999) (J. Kennedy, *dissenting*)

A school district that receives federal funds may be liable for student-on-student harassment if the district (1) had actual knowledge of the harassment, (2) the harasser was under the district's control, (3) the harassment was based on the victim's sex, (4) the harassment was "so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit[,]" and (5) the district was deliberately indifferent to the harassment. *See Davis,* 526 U.S. at 650. The Ninth Circuit has held that the legislative history of Title IX "strongly suggests that Congress meant for similar substantive standards to apply under Title IX as had been developed under Title VII." *Emeldi v. Univ. of Oregon*, 698 F.3d 715, 724 (9th Cir. 2012). In reaching this conclusion, the Ninth Circuit noted that "the Supreme Court has often 'looked to its Title VII interpretations of discrimination in illuminating Title IX.'" *Id.* at 725 (quoting *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 616 n.1 (1999)). The Court follows this approach in determining the contours of the Title IX action.

As discussed in turn below, the Court finds Plaintiffs have not met their burden in producing evidence that YAF's complained-of conduct was "because of sex"; Plaintiffs have not demonstrated Defendant Wenatchee School District had

actual knowledge of the alleged offenses, even if the conduct was actually based on sex; and Plaintiffs have also failed to demonstrate Defendant acted with deliberate indifference.

### 1. *"Because of sex"*

Whether conduct rises to the level of actionable harassment "depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved." *Davis*, 526 U.S. at 651 (internal citations and quotation marks omitted). The Supreme Court has recognized that the context is important, explaining:

> Courts, moreover, must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults. [citation omitted]. Indeed, at least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it. *Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender*. Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.

*Davis*, 526 U.S. at 651-52 (1999) (emphasis added). Distinguishing between "simple teasing or roughhousing" and "hostile or abusive" behavior requires the court to rely on "[c]ommon sense" and an "appropriate sensitivity to social

context[.]" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998). "[M]erely" using words that "have sexual content or connotations" does not demonstrate there was "discrimination because of sex". *Id.* at 80. "It is not enough to show . . . that a student has been 'teased,' . . . or 'called ... offensive names,'" and it is misleading to suggest Title IX liability arises where "an 'overweight child [] skips gym class because the other children tease her about her size[.]'" *Davis*, 526 U.S. at 652.

The plaintiff may meet the burden of demonstrating an action was taken because of sex (1) directly where the conduct is such that it is "clear that the harasser is motivated" by sex or (2) indirectly by introducing comparative evidence about how the "harasser treated members of both sexes". *Oncale*, 523 U.S. at 80-81 (1998). "Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* ... because of ... sex.'" *Id.* at 81 (emphasis and brackets in original) (quoting Title VII). "A plaintiff's belief that a defendant acted from an unlawful motive, without evidence supporting that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive. To be cognizable on summary judgment, evidence must be competent." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001).

1    Plaintiffs argue the name calling "was less about calling [IV's] sexual

2    preference into question, but rather designed to demean [IV] as not fitting into

3    what [YAF] perceives as the masculine norm, and is one form of gender-based

4    discrimination." ECF No. 47 at 2 (relying on the opinion of Ms. Strauss). This

5    suggests Plaintiffs are abandoning their argument that YAF's conduct is actionable

6    as discrimination based on sexual orientation; however, Plaintiffs later argue the

7    actual sexual orientation of the plaintiff is not relevant. ECF No. 47 at 16. Even if

8    Plaintiffs are correct, and even assuming Title IX covers discrimination based on

9    sexual orientation, Plaintiffs would still need to show YAF perceived IV as having

10   another sexual orientation and that the conduct was because of such. However,

11   Plaintiffs have presented no such evidence. Importantly, neither IV nor the other

12   students that were deposed mentioned IV was being picked on because IV was

13   homosexual, or that YAF perceived IV as being homosexual; Plaintiffs did not

14   even depose YAF. Although the language was arguably tinged with sexual

15   connotation, the record demonstrates YAF directed this type of abusive language

16   to a number of his victims as a way to insult them generally. As Defendant's

17   expert, Sherryll Kraizer, PH.D., notes:

18           In my educational experience, working with students in elementary and
             middle school, there is no question that the terms, "fag," "faggot," "bitch"
19           and "gay" are ubiquitous. They are used with high frequency by boys too
             young to initially know that the terms have any sexual connotation and later
20           as a freeflowing insult. While it may have a gender or sexual orientation

meaning in some contexts, that interpretation is not consistent with the history of [YAF] generally, or specifically regarding his bullying of [IV].

ECF No. 58 at 4, ¶ 10. The Court agrees with Dr. Kraizer's observation.

Plaintiffs also argue that YAF targeted IV's weight because IV did not fit YAF's view of masculinity, but there is simply no support for this contention. As noted above, Plaintiffs' expert opinion on this point rests merely on conjecture and her own *ipse dixit*, and so do Plaintiffs in their briefing. Plaintiffs have presented no evidence as to what YAF's perception of masculinity is, or that his conduct was even remotely related to such. None of the testimony even mentions masculinity, and Plaintiffs never made related allegations in their Amended Complaint. Plaintiffs did not even depose YAF and their expert did not interview him.

Rather, the evidence demonstrates YAF targeted IV because YAF was a bully, and, as bullies tend to do,[10] he targeted a weaker student,[11] identified a source of humiliation, and capitalized on it. As Dr. Kraizer explains: "[b]ullies are

---

[10]   Defendant's expert, Dr. Kraizer, cites "StopBullying.gov", which states bullying is behavior that is aggressive and includes "[a]n imbalance of power, kids who bully use their power—such as physical strength, access to embarrassing information, or popularity—to control or harm others." ECF No. 58 at 7, ¶ 12.

[11]   YAF did the "same things" to another student until the student challenged YAF to a fight; IV was not strong enough to challenge YAF. ECF No. 57-2 at 5.

very adept at identifying things about a victim that can be exploited and that will embarrass the victim" and "one of the most common things a bully will pick on is weight." ECF No. 58 at 8, ¶ 18. This is consistent with the record, which demonstrates YAF bullied many students in the same or similar manner as YAF bullied IV. Moreover, Plaintiffs rely on the presumed connection between being overweight and not falling in line with YAF's view of masculinity, but it is undisputed that YAF continued to bully IV even after IV lost weight (thus falling back in line with what Plaintiffs assume is YAF's view of masculinity).

Considering the "constellation" of facts, including the context, age, and surrounding events, informed by common sense, the Court finds Plaintiffs have failed to meet their burden that YAF's conduct was "because of sex". Rather, the evidence submitted demonstrates YAF was a bully that targeted many in his class, regardless of gender, alleged sexual orientation (whether actual or perceived), and regardless of whether they were overweight (or otherwise did not conform with YAF's supposed view of masculinity). Although some of the complained of conduct is arguably "tinged" with sexual connotation, Plaintiffs have simply failed to demonstrate YAF's conduct was outside of common-place insults used by bullies, *see* ECF Nos. 63-1 at 8; 58 at 4, ¶ 10 (experts recognizing conduct is common in middle school), in their simple quest to demean and subjugate others.

## 2. *Actual knowledge; Deliberate indifference*

To maintain his Title IX cause of action, IV must establish that "an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the . . . misconduct." *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998); *see also Doe v. Willits Unified School Dist.*, 473 Fed. Appx. 775 (9th Cir. 2012) ("Damages under Title IX are available only if an official with authority to address the alleged discrimination and institute corrective measures has actual knowledge of the discrimination and fails to adequately respond—*i.e.*, acts with deliberate indifference."). "[I]t is generally accepted that the knowledge must encompass either actual notice of the precise instance of abuse that gave rise to the case at hand or actual knowledge of at least a significant risk of sexual abuse." *Ross v. Corp. of Mercer Univ.,* 506 F.Supp.2d 1325, 1347–48 (M.D. Ga. 2007). An actor is deliberately indifferent when they "make 'an official decision . . . not to remedy the violation'" and their response is "clearly unreasonable in light of the known circumstances". *Davis,* 526 U.S. at 642, 648 (quoting *Gebser*, 524 U.S. at 290. "The high standard seeks to eliminate any 'risk that the [district] would be liable in damages not for its own official decision but instead for its employees' independent actions.'" *Davis*, 526 U.S. at 643 (quoting *Gebser*, 524 U.S. at 290-91).

Here, viewing the facts in the light most favorable to Plaintiffs, the record

shows: (1) a student informed Ms. Self and Ms. Brown that YAF was "picking on"

and "bullying" IV;[12] (2) a student informed Ms. Brender that an un-identified

student was bullying IV because of his weight and giving IV "titty twisters";[13] (3)

IV's mother informed Ms. Brender that IV was being bullied during PE and in the

locker room and that it included someone calling IV "fat" and a "faggot" and

twisting his nipples;[14] (4) and IV's mother informed Ms. Brown that YAF was the

bully and "went into detail about how the bully had called [IV] names, twisted his

nipples, and shamed him in front of others."[15]

The general reports of "bullying" and being "picked on" are "plainly

insufficient" to establish actual knowledge of sexual harassment as they do not

relay any substance suggesting sexual harassment could be at play. *See Gebser*,

524 U.S. at 291 (reports of "inappropriate comments" made during class was

"plainly insufficient to alert the principal to the possibility [a teacher] was involved

in a sexual relationship with a student."). The reports that IV was being bullied for

---

[12]     ECF No. 51-7 at 5-6, 8.

[13]     ECF No. 41 at 3, ¶ 11.

[14]     ECF No. 42-3 at 9.

[15]     ECF No. 49 at 3-4, ¶ 9.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT DISMISSAL OF PLAINTIFFS' TITLE IX CLAIM; GRANTING
IN PART DEFENDANT'S MOTION TO STRIKE ~ 28

his weight, being called "fat" and "faggot", and receiving "titty twisters" is also insufficient because the conduct, although reprehensible, is common-place bullying amongst middle school boys; as such, without more detail, this does not give Defendant notice that the bullying is because of IV's sex.

At most, Defendant was alerted to intense bullying that *could have constituted sexual harassment*, but this is not actual knowledge of harassment; nor is it actual knowledge of a significant risk of abuse based on sex given the context where the complained of names are used as a freeflowing insult. Notably, the nub of Plaintiffs' argument is that YAF targeted IV because of IV's (perceived) sexual orientation or failure to fit YAF's view of masculinity, but no one reported IV was being harassed because of his sexual orientation (whether actual or perceived) or his lack of masculinity. Plaintiffs also argue Defendant was put on notice because the school had reprimanded YAF for alleged sexual harassment, but this was directed at female students and does not put Defendant on notice that YAF is sexually harassing boys like IV.

Moreover, the record shows Defendant acted reasonably in addressing the complaints about YAF. First, the record shows the District reasonably addressed YAF's conduct toward others besides IV, as the District held numerous parent conferences and suspended YAF multiple times for his conduct aimed at others. Second, the record shows the District reasonably addressed YAF's conduct toward

IV to the extent they were aware of YAF's conduct. Although early complaints only led to YAF being talked to about the incident, these complaints were only generalized complaints of being picked on and bullied—again, something the Court recognizes is relatively commonplace in middle school. Once IV's mother informed Ms. Brender about bullying, the PE teacher was contacted and asked to watch out for bullying and IV's class schedule was altered.[16] Later, when Ms. Brown became aware of more details and YAF's involvement in January, 2016, the District took steps to expel YAF and actually expelled and transferred him to another school.[17] Given the context, including the age of the parties involved, Defendant's response to the complaints was not "clearly unreasonable".

---

[16]     Although Ms. Olivares asserts the schedule was changed as a result of a doctor's order, Ms. Olivares does not have personal knowledge that actually disputes Ms. Brender's representation that she reached out to the PE teacher and was involved in changing IV's schedule. *See* ECF Nos. 41 at 4, ¶ 19; 43 at 3, ¶ 11; 49 at 4, ¶ 11.

[17]     It matters not whether YAF returned to school for a day after his initial emergency expulsion. The parties do not dispute that this was a result of a mistake. *See* ECF Nos. 26 at 11-12; 49 at 3, ¶ 6.

## CONCLUSION

Defendants have demonstrated there is no genuine issue of material fact and that they are entitled to summary judgment on Plaintiffs' Title IX claim.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Defendant Wenatchee School District's Motion for Summary Judgment Dismissal of Plaintiffs' Title IX Claim (ECF No. 50) is **GRANTED**.

2. Defendant Wenatchee School District's Motion to Strike (ECF No. 59) is **GRANTED IN PART**.

The District Court Executive is directed to enter this Order, furnish copies to counsel.

**DATED** September 19, 2018.



THOMAS O. RICE
Chief United States District Judge